IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

NAISHA PANTOJA, )
)
    Plaintiff, )
)
v. )
) Civ. No. 16-232-SLR
MEGAN BRENNAN, Postmaster General )
of the United States Postal Service, )
)
    Defendant. )

John M. LaRosa, Esquire of LaRosa & Associates, Wilmington, Delaware. Counsel for Plaintiff. Of counsel: Christine E. Burke, Esquire of Karpf, Karpf & Cerutti, P.C., Bensalem, Pennsylvania.

David C. Weiss, Esquire, Whitney C. Cloud, Esquire, and Laura Hatcher, Esquire of United States Attorneys Office, Wilmington, Delaware. Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: June 29, 2017
Wilmington, Delaware

ROBINSON, Senior District Judge

I. INTRODUCTION

Plaintiff Naisha Pantoja ("plaintiff") sued Megan Brennan (the "defendant"), in her capacity as postmaster general of the United States Postal Service (the "Postal Service"), for violation of Title VII of the Civil Rights Act of 1964. (D.I. 1) Plaintiff alleges that the Postal Service, as her former employer, subjected her to religious discrimination by: (1) failing to provide reasonable accommodation; and (2) terminating her in retaliation for complaints of discrimination.[1] (D.I. 1 at ¶ 28; D.I. 30 at 1) Defendant has moved for summary judgment. (D.I. 26) The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

II. BACKGROUND

The parties broadly agree about the events that occurred, and occasionally present conflicting versions of certain details. Nevertheless, defendant has, for purposes of this motion, assumed that plaintiff's version of the facts is true. (D.I. 27 at 2) More important, the court finds that those factual disputes, where they exist, are not material to resolving defendant's motion for summary judgment.

### A. The Duties and Expectations of City Carrier Assistants

On April 5, 2014, the Postal Service hired plaintiff as a City Carrier Assistant for the Lancaster Ave. station. (D.I. 28-15 at -217) City Carrier Assistants are temporary employees hired on a one-year trial basis to determine whether they merit a career

---

[1] Plaintiff waived any claim based on disparate treatment when she did not respond to defendant's arguments on that issue and instead stated that her claims were based only on accommodation and retaliation. (See D.I. 27 at 15-20; D.I. 30 at 1; D.I. 31 at 1-2).

position. (D.I. 28-1 at 2; D.I. 28-2) Lancaster Ave. station is a busy office with 60-70 mail carriers and dozens of mail routes. (D.I. 28-21 at 15:8-15, 13:8-23) The duties of City Carrier Assistants require "arduous exertion," resulting in some City Carrier Assistants leaving before the end of their term. (D.I. 28-19 at 59:1-23; D.I. 28-2 at -208)

City Carrier Assistants are treated differently than career employees. (D.I. 28-1 at 8-9) A supervisor may request to remove a City Carrier Assistant from the Postal Service for "just cause" based on the first infraction. (*Id.*) For smaller infractions, a supervisor may conduct a pre-disciplinary interview and then choose whether to issue discipline such as a letter of warning. (D.I. 28-21 at 15:22-24, 16:10-24) A supervisor does not need higher management approval to issue discipline; however, the supervisor generally seeks approval when requesting suspension or removal. (*Id.* at 17:2-8) In addition, City Carrier Assistants are not eligible for uniforms until they achieve certain work milestones. (D.I. 28-1 at pp. 4-5) In the interim, they are permitted to wear work-appropriate clothing. (*Id.*) Plaintiff testified that she generally wore a khimar and garb or sweats to work.[2] (D.I. 28-19 at 51:11-25)

### B. Plaintiff's Disciplinary Issues

Plaintiff had several disciplinary issues in the summer of 2014. On July 11, 2014, plaintiff did not deliver an assigned route. Per the disciplinary structure for City Carrier Assistants, Supervisor Lewis conducted the pre-disciplinary interview and thereafter issued plaintiff a letter of warning dated July 18, 2014. (D.I. 28-3) A week later, on July

---

[2] A khimar is a headscarf worn in public by some Muslim women; garb is a more general term by which plaintiff refers to a long dress. (D.I. 28-19 at 51:12-15, 52:15-20)

2

24, 2014, Supervisors Pollard-McGrath and Carpenter issued another letter of warning to plaintiff for failing to scan route markers. (D.I. 28-4)

On August 8, 2014, Supervisor Carpenter assigned plaintiff a route and gave her "Red Plums" (advertisements) to deliver. (D.I. 28-19 at 124-128) Plaintiff questioned her assignment, because she thought the Red Plums should have been delivered the day before while she was out. (*Id.*; D.I. 28-16 at -151) This led to a meeting with plaintiff, Supervisor Carpenter, Postmaster Maher, and Manager Toombs. (D.I. 28-19 at 124-128) Plaintiff alleges that during the meeting, Supervisor Carpenter had an attitude, Postmaster Maher grabbed her shoulder, and all three were yelling at her. (*Id.*) Plaintiff does not allege that any official made any discriminatory comments, questioned her clothing, or questioned her religion during the meeting. After the meeting, plaintiff left the postal station citing health issues and did not return to work for a week. (*Id.* at 177:20-24; D.I. 28-15 at -217)

On August 22, 2014, plaintiff went to the Lancaster Ave. station to collect a form for her doctor to sign so she could return to work. (D.I. 28-19 at 179:5-17, 181:13-182:8) Upon her arrival, Supervisor Pollard-McGrath assigned her a route. (*Id.* at 187:11-188:25) Plaintiff informed Supervisor Pollard-McGrath that she was there only to collect a form for her doctor's appointment that day. (*Id.* at 183-184) Although there appeared to be some confusion as to whether plaintiff's appointment was canceled, ultimately Supervisor Pollard-McGrath told plaintiff she should go to the doctors and then come back to work, but make sure she changed her clothes before she came back, because she "wasn't properly dressed to deliver the mail." (D.I. 28-14 at -175) Plaintiff said at the time she had "her garb on[;] face showing." (*Id.*) Plaintiff's

appointment with the doctor did not finish until around 3:00 p.m., and she did not return to work and deliver the route. (D.I. 28-19 at 184:16-25, 188:21-25) Plaintiff was marked absent without leave, but she was not disciplined. (D.I. 28-22 at 30-32)

On August 24, 2014, plaintiff told work that she was not sure if she was on the schedule but could not come in anyway because she lost her car keys. (D.I. 28-7) Plaintiff was on the schedule for that day. (*Id.*) In response, Postmaster Maher sent Manager Toombs an email stating that plaintiff "needs to be issued a removal." (*Id.*)

August 25, 2014, plaintiff told Supervisor Pollard-McGrath that she needed help completing a route, because she wanted to leave early to go to the police station to resolve a car break-in. (D.I. 28-19 at 197-198; D.I. 28-9 at 2) Plaintiff claims that Supervisor Pollard-McGrath responded by criticizing her clothing and kicking her out of the station. (D.I. 28-19 at 199:4-23) Plaintiff did not complete her route. (D.I. 28-9 at 2) Plaintiff was sent a letter to appear for a pre-disciplinary interview on August 29, 2014. (D.I. 28-8)

### C. Management's Request to Remove Plaintiff

On August 29, 2014, Supervisor Pollard-McGrath conducted a pre-disciplinary interview with plaintiff to discuss the incident on August 25. (D.I. 28-8; D.I. 28-9) Rose King, a union official representing plaintiff, was also present. (*Id.*) Supervisor Pollard-McGrath asked plaintiff if she was prepared to work that day (August 29). (D.I. 29-9 at 3) Plaintiff indicated that she was not prepared to work, because the letter she received setting up the August 29th meeting "didn't state that." (D.I. 28-14 at -175; D.I. 28-16 at -157) Supervisor Pollard-McGrath, Ms. King, and plaintiff also discussed whether plaintiff was properly dressed to work. (D.I. 29-9 at 3; D.I. 28-19 at 204-205) According

4

to Ms. King, she asked Supervisor Pollard-McGrath if plaintiff could go home and come back prepared, to which plaintiff responded that she could not come back, because she had made other plans for the day.[3] (D.I. 29-9 at 3) According to plaintiff, Supervisor Pollard-McGrath said there was "no point" in having plaintiff change, because she was "never properly dress[ed] to work." (D.I. 28-14 at -175) After the meeting, plaintiff did not work. (D.I. 28-9 at 2) That same day, Supervisor Pollard-McGrath and Manager Toombs formally requested removal of plaintiff based on the disciplinary actions that occurred on July 18, July 24, and August 25. (D.I. 28-11) The request was sent to labor representatives to approve, process, and complete a "notice of removal." (*Id.*) The notice of removal was finalized on September 17, 2014 and states that the reason for removal is plaintiff's "improper conduct/failure to follow instructions" as demonstrated on July 18, July 24, and August 25. (D.I. 28-12)

On September 3, 2014, five days after Supervisor Pollard-McGrath initiated the removal process, plaintiff requested pre-complaint counseling from the Postal Service's Equal Employment Opportunity ("EEO") agency. (D.I. 28-13 at ¶ 3; D.I. 28-14) In her EEO forms, plaintiff alleged discrimination based on "religion the way I dress Muslim." (D.I. 28-14 at -174) When asked to describe the discrimination, plaintiff wrote that Supervisor Pollard-McGrath told her she was not in proper attire for work on August 22, when she arrived to pick up the doctor's form, and on August 29, during the pre-disciplinary interview. (*Id.*) No other discriminatory acts or actors were alleged. On September 11, 2014, Counselor Alpheaus was assigned to investigate the case. (D.I.

---

[3]  In her deposition, plaintiff testified that Ms. King did not ask if plaintiff could go home to change, but in her pre-counseling forms, plaintiff states that Ms. King did ask. (Compare D.I. 28-19 at 205:1-7 with D.I. 28-14 at -175)

5

28-13 at ¶¶ 23-24) Thereafter, plaintiff received a notice of removal and told Counselor Alpheaus. (*Id.* at ¶¶ 26-27) Counselor Alpheaus contacted Manager Toombs and Supervisor Pollard-McGrath for the first time after plaintiff received her notice. (*Id.* at ¶ 28) Counselor Alpheaus sent introductory emails about plaintiff's informal complaint to Manager Toombs and Supervisor Pollard-McGrath on October 1, 2014. (*Id.*) The counselor's efforts to reach a resolution among the parties was unsuccessful, so on November 25, 2014, she alerted plaintiff of her right to file a formal EEO complaint. (*Id.* at ¶ 30) Meanwhile, management's decision to terminate plaintiff went through the informal and formal grievance processes pursuant to the Postal Service's collective bargaining agreement, and was upheld. (D.I. 28-15) Plaintiff's removal was effectuated in November 2014.

Plaintiff filed her formal EEO complaint with the Postal Service's EEO agency on December 1, 2014. (D.I. 28-16 at -158) The formal complaint described three incidents of alleged discrimination: the meeting on August 8 regarding the RedPlum advertisements; the meeting on August 22 when plaintiff arrived at work to pick up the doctor's form; and the pre-disciplinary interview on August 29. (*Id.* at -151) Plaintiff alleged that in the August 8 meeting she was "verbally attack[ed], scrutinized, and looked down upon" for questioning why the Red Plum advertisements were not delivered the day before. (*Id.*) Plaintiff alleged that in the August 22 and August 29 meetings she was "picked on about [her] attire." (D.I. 28-16 at -155) The EEO agency accepted for investigation these three incidents and plaintiff's notice of removal issued around September 18, 2016. (D.I. 28-17) On February 5, 2016, the EEO agency issued its final decision denying plaintiff's claims for religious discrimination based on

disparate treatment and /or retaliation. (D.I. 28-18) There was no analysis of a claim for religious accommodation. (*Id.*)

## III. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10 (1986). The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

If the moving party is able to demonstrate an absence of disputed material facts, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment. Id. Rather, the nonmoving party must present enough evidence to enable a jury to reasonably find for it on that issue. *Id.* If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

Although defendant raised several arguments, the court finds, as explained in more detail below, that the accommodation claim fails because plaintiff did not exhaust her administrative remedies. (D.I. 27 at 10-13) The retaliation claim fails because plaintiff cannot prove causation. Accordingly, the court grants summary judgment in defendant's favor on plaintiff's religious discrimination claims.

### A. Accommodation

Before bringing suit under Title VII in federal court, a plaintiff must exhaust her administrative remedies. *Webb v. City of Phila.*, 562 F.3d 256, 262 (3d Cir. 2009). "The purpose of this administrative exhaustion requirement is to put the EEOC on notice of the plaintiff's claims and afford it 'the opportunity to settle disputes through conference, conciliation, and persuasion, avoiding unnecessary action in court." *Id.* (*quoting Antol v. Perry*, 82 F.3d 1291, 1296 (3d Cir. 1996)). To establish a prima facie case of a failure to accommodate claim, plaintiff must show: "(i) she holds a sincere religious belief that conflicts with a job requirement; (ii) she informed her employer of the conflict; and (iii) she was disciplined or subject to an adverse employment action for failing to comply with the conflicting requirement." *E.E.O.C. v. GEO Grp., Inc.*, 616 F.3d 265, 271 (3d Cir. 2010).

Plaintiff's narrative in her informal and formal complaints did not put either the EEO investigator or the EEO agency on notice of her accommodation claim. Plaintiff's complaints are devoid of any allegation that she needed or was denied a religious accommodation. Plaintiff does not allege that her clothing conflicted with a job requirement. Indeed, plaintiff repeatedly asserted that she wore whatever she wanted

to work, as did other temporary employees, and previous supervisors had no issues with her attire. (*See, e.g.*, D.I. 28-17 at -075 ("I've been wearing my jilbab since I've been working here"); *Id.* at -80 ("I've been wearing the same thing since I've been there"); *Id.* at -071 (stating that "everyone else was allowed to come to work with anything they wanted to wear"); *Id.* at -080 (stating that previous supervisors "never cared" about her clothes)).

Instead, the crux of plaintiff's claims was that she was targeted and treated differently by a particular supervisor, because of her religion. (*See, e.g.*, D.I. 17 at -071 (stating that she was being "treated less than human" compared to everyone else who wore what they wanted); D.I. 30 at 16 (arguing that plaintiff alleged that "she had been singled out due to her religion and picked on")) As a result, the EEO investigation focused on whether plaintiff was targeted, treated differently, or terminated because of her religion. (*See*, D.I. 28-13; D.I. 28-17) Similarly, the final decision of the EEO agency analyzed only claims for disparate treatment and retaliation. (D.I. 28-18) Neither the investigation nor the agency considered facts or issues relevant to a religious accommodation claim, including whether plaintiff's desire to wear religious garb conflicted with any Postal Service policy, whether her garb interfered with her ability to perform her job responsibilities, or whether plaintiff should be permitted to continue to wear what she had always worn to work. Thus, there is no evidence that plaintiff exhausted her administrative remedies with respect to a religious accommodation claim. *See, e.g., Ocasio v. City of Bethlehem*, 2009 WL 37518, at *3 (E.D. Pa. Jan. 7, 2009) (finding that plaintiff failed to exhaust his administrative

remedies because his discrimination claim did not put EEO on notice of claims for retaliation, harassment, and hostile work environment).

Plaintiff argues that the EEO was on notice of her accommodation claim, because it recited the standard for an accommodation claim in its final decision. (D.I. 30 at 16) The EEO included the standard in a general overview of law governing each type of discrimination claims. (D.I. 28-18 at 4) Accommodation is not mentioned anywhere else in the carefully-considered, single-spaced, seventeen-page decision. Accordingly, this tenuous mention of accommodation is not enough to show that the EEO was on notice of plaintiff's claim.

### B. Retaliation

Plaintiff claims that the Postal Service retaliated against her for protected activity, namely filing an informal EEO complaint on September 3, 2014. (D.I. 1 at ¶¶ 21-22) In order to claim retaliation, a plaintiff must make a prima facie showing that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006); *see also Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (noting that protected activity includes filing formal charges and making informal protests to management). To prove causation, "the plaintiff must show that she would not have suffered an adverse employment action 'but for' her protected activity." *Young v. City of Phila. Police Dep't*, 651 F. App'x 90, 96 (3d Cir. 2016). If the plaintiff establishes a prima facie case, "'the burden shifts to the employer to advance a legitimate, non-retaliatory reason' for its conduct and, if it does so, 'the plaintiff must be

able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Moore*, 461 F.3d at 342 (*quoting Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997)).

Plaintiff's claim of retaliation fails at the prima facie level, because the undisputed facts show that the Postal Service decided to terminate plaintiff before plaintiff approached the EEO, not after. The Postal Service initiated the removal process on August 29, 2014; plaintiff filed an EEO complaint on September 3, 2014. (Compare D.I. 28-11 with D.I. 28-14) Thus, the Postal Service did not and could not have acted with retaliatory animus when it decided to initiate termination before plaintiff made her complaints to EEO. *Cf. Glanzman v. Metropolitan Mgmt. Corp.*, 391 F.3d 506, 516 (3d Cir. 2004) (noting that adverse action for protected activity was not possible when the employee had already been terminated). For this reason, plaintiff's retaliation claim fails.

## V. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (D.I. 26) is granted. An appropriate order shall issue.